States v. Mathews. Mr. Clue. I understand Mr. Wiedlanski is here now. We know Miami traffic is still recovering from weather related issues. I think Atlanta traffic is worse. Depends on how far you have to come. I live close to the courthouse. I get there in 15 minutes. Depends on where you live. Is the defendant addressed as Martinez or Mathews? His name is Mathews. His Spanish name, when they are double names, the first name is the father's surname and the second name is the mother's surname. Some people use both names and some people just use the father's name. If they only use one name, it is always the father's name, which would be the first of the last two. I am sure Judge Jordan can explain it better. I think you have it right, Mr. Clue. Just tell us this particular person, what The issues we have raised on appeal are principally guideline interpretation issues. I want to go straight to the first issue, which is the pre-sentence investigation report in this case found that this defendant, who had cooperated with law enforcement from the beginning of the case, should get acceptance of responsibility. The District Court's sua sponte at the sentencing raises the issue of a single positive test for drug use. The District Court states on the record that this disqualifies the defendant, it bars him, and then the District Court asks the probation officer who is present in court, can you confirm that? And the probation officer then confirms, yes. In words to that effect, you cannot impose the adjustment because this The error is the District Court believed it lacked authority to grant acceptance. That's the error. Yes, Your Honor. This should go back for him to evaluate whether or not he should get acceptance of responsibility. Is that what the remedy is? Exactly. It's not Am I correct? He actually had passed a bunch of drug tests. This was the only one he failed? Or am I confusing that with another case? He passed 18 consecutive drug tests. It was just the very last. And again, the reason given, and I think the reason it's accurate, is that there can be an extraordinary pressure on a person with a weakness for that type of thing. Anything can happen to a person. Really, the issue is whether the District Court misapprehended that he didn't have authority. And I think the record supports your argument. The District Court states, it seems to me that under the rules, if he tested positive, that's a violation of the law and he loses acceptance. And it's not a per se rule. And the probation officer says, that's correct, he doesn't get it. But the fact of the matter is, I know from sentencing, it's discretionary. I mean, he could not get it. It's up to the judge to consider all the facts and circumstances. So we'll ask the government where I'm wrong on that. What is your next issue? The next issue is whether in this, there were two counts of the offense. One is damage to a computer and one is obstructing the VA's investigation following the death of a patient. And in the context of those offenses, the question is whether what this defendant did constituted, merited a vulnerable victim enhancement. And our position is that in this case, the government has two separate theories. One, their theory is that you can be a vulnerable victim and you passed away. Why that you could be considered a vulnerable victim if somebody obstructs that investigation. And we don't see any support for that type of analysis in the case law. For the vulnerable victim enhancement? For the vulnerable victim enhancement. Well, didn't he, didn't Mr. Martinez begin to alter records while the patient was still alive? Well, I was starting about count two first. Count one relates to inputting telemetry data to sort of revisionist telemetry data while the patient was still alive. And the circumstances there are, the offense is damaging a computer belonging to the government. Well, he didn't damage the computer, he made false entries. Right, it's just titled as damage. And if you create wrong data in a computer, you commit the offense. He didn't smash it with a hammer. No, he did not. It was the data entries that was the issue. Our position on that is that ordinarily there has to be a closer connection between, clearly there's no intent to harm the patient here. The patient had been under the care of, as far as the record shows, completely adequate doctors and nurses in a completely adequate room for him at the time for two and a half hours at the time this happened. In other words, this is not something he's doing at the time that it's, when he's under control of the patient. This is when two and a half hours of monitoring at another unit. So there's no indication he's doing it with an intent to harm the patient. Did he explain why he did it? The factual basis stipulates that he did it because, oh my God, they're going to look back at this and they're going to see, I'm supposed to, when a patient's blood oxygen level fluctuates, which is what the record shows, it fluctuated, I'm supposed to call the doctor. It was a cover-up for his not being, doing his job. It was a cover-up for him failing to... But I don't know why under relevant conduct you can't consider that it was a 76-year-old very ill person and he did this and he's the victim here. I don't think the victim is always the United States. Under relevant conduct, the victim here is this man. Well, we've relied in our briefs on what we believe is a strict interpretation of the guideline language with regard to what is the offense and what is relevant conduct to the offense. And as our reply brief and pages 18 to 19 of our initial brief indicate, the offense conduct itself certainly did not harm this patient. The offense conduct itself had no impact. Nobody knows whether it did or didn't. Well, the record, the government failed to show any of it. We actually know. I mean, from the facts that weren't presented in the district court, we actually know that it didn't do anything. That data, the way the system actually works is until that data that he's typing into his system is intentionally accessed by somebody else or until he sends it to somebody else, it never has any effect. And that data was never even sent to anybody else until after the, until two days later. And nobody asked for it until two days later. But you keep focusing on the data. The relevant conduct is his substandard care for the patient and dereliction of his nursing duty. This is clearly relevant conduct to the false record convictions. And that is where the vulnerable victim enhancement can come to. It's just like if you've got a drug case and you've got a firearm, you can give a . . . you're not charged with a firearm offense, but you can get an enhancement for the firearm. Okay? It seems to me the enhancement's warranted here because this was an extremely vulnerable victim and the relevant conduct is his substandard care. I want to answer the question. I don't want to belabor the point, particularly if I'm losing. I don't want to belabor the point. But I want to get to the other issue. But my view of the case law on this, and I think that there is some ambiguity, is that because of the language in the guideline, in the concept of relevant conduct, my understanding of relevant conduct means other kinds of conduct that you can find a guideline for, other kinds of criminal conduct, that relevant conduct doesn't include . . . although any conduct can be considered on the variance issue, any conduct can, substandard care can, but that relevant conduct refers to criminal conduct. And so the government's argument that he's covering up . . . that was . . . and we say in our reply briefs, that's clearly their substandard care. But the purpose of that and the effect of that was not on the patient or having to do with the patient. The purpose of that solely was he'd had a 16-year career in the VA and he was trying to keep his job. And so that's our first answer to that. And the second answer that's maybe more tenuous . . . But you know, it says course of attempting to avoid detection. That's relevant conduct. Clearly relevant conduct can be non-criminal conduct. Again, I don't want to lose my time arguing the point I've made. My position is that what he's trying to cover up is his medical . . . his lack of failure as a medical professional. And while it is a crime and he shouldn't do it and it hurts the government, you cannot go back under the relevant conduct guidelines and go back to the substandard care and say that if somebody's a victim of substandard care, then that is the relevant conduct. And the distinction is . . . this Court's Your Honor's decision in Moran, I think, is the most relevant decision that the government cited. In a case in which you've . . . the purpose of the scheme is to deprive the person of the care they need. And the scheme effectively deprives the person of the care they need. Then that is a consequence of the actual criminal conduct. But the criminal conduct here had no such purpose, nor did it have any such effect. Nor was it intended to have any such effect, nor . . . Do you want to go to your alteration of records? Yes. The argument there is that we have one patient record. We have one patient record. And that's . . . Let me ask you about that. That guideline has or especially probative record. It seems to me, rather than having to reach the substantial number of records issue fabrication, it says or especially probative record, a single record. And this was an especially probative medical record when he was moved to the ICU. This record would have been highly important to the ICU when he got moved there. And I recognize this Court has said that there's no constitutional vagueness limit on guideline language. But again, when language like especially probative . . . what the probative here would have been, it would have been probative of the fact that he had failed to alert a doctor that the patient's oxygen was fluctuating. And the question of whether that is really what the guideline is going after, is that really what the investigation was about? Is that really what was being obstructed? Is that so especially probative? And I don't think there's any case that would show that somebody who is part of an investigation . . . and a lot of investigations happen this way, where you start the investigation and you go off and looking at something else and the person is doing something else and they're trying to conceal something relating to them. It may be especially probative to what they're concerned about, but as the record shows in here, it has zero probative value as to why this patient died. Zero. And zero . . . But the investigation was into more than just why he died. It was . . . was the . . . was . . . did he receive adequate care? I understand that. But in terms of especially probative . . . and you rarely see adverbs in these type of guidelines, but I think it should be given some weight. Especially probative means something essential. And the case law indicates both that something is actually completely damaged that really impedes the investigation, and of course there was no impeding of the investigation here because his futile attempt to do that didn't wipe out what was in the computer data. He just tried to . . . he put a veneer of . . . of if you're just looking at me, well it's not my fault, you don't have to look any further. It turns out arguably it wasn't his fault anyway, so we don't think it's especially probative within the meaning of those terms in the guidelines. I reserve my . . . on the brief on the remaining issue. All right. You've still got your five for rebuttal. Mr. Widlanski? May it please the Court. Assistant U.S. Attorney Ben Widlanski for the United States. I was the Assistant U.S. Attorney in the District Court with me at counsel table. A was a Carol Herman who wrote the brief. Your Honor, if I could approach the first issue . . . I'm Mr. Kluw is discussing that of the especially probative records. Mr. Kluw states that by the record there was no reason to assume that Mr. Martinez-Matthews' conduct contributed to the death of the victim. That's not true and is belied by the record. On page two of the factual proffer, it's clear we set out, and this was a document signed by Mr. Martinez-Matthews, that the patient's vital signs were fluctuating wildly through the entire course of September 2nd, which was the day that he was under his care. And that the reason he made these changes in the record was because he knew that this was going to come back on him, that it was going to look like he was giving poor care because he was, in fact, giving poor care. That is also in the factual proffer. Also in the factual proffer is a statement, not an equivocal statement, but an unequivocal statement, that had Mr. Martinez-Matthews provided the appropriate level of care, the patient would not have been transferred out of the Surgical Intensive Care Unit. Surgical Intensive Care Unit, the VA, is the highest level of care available for patients. That's where the sickest, most needy patients are. The ward that he was transferred to was not a telemetry ward, as Mr. Kluw represented in the brief. It was a standard step-down post-surgical ward, a general ward that had telemetry capabilities. Is there anything in the record that indicates that his conduct here contributed to Mr. Patient A's death? It does not, Your Honor, but I would submit that the death of the patient is not the only potential harm here. It's not the only harm, and that's not the only reason why the patient is a victim. The fact that his medical records were no longer accurate, the fact that his medical records did not fully encapsulate his entirety of care, that is harm in and of itself. When people's records, particularly their medical records, but their bank records, for instance, are harmed, that is a harm to the person. When your identity is stolen, that is a harm to a person, not just if your identity is then later used to create a credit card account, a fraudulent credit card account. The fact that your identity is stolen is in itself a harm. I'm not sure this is comparable to identity theft, but OK. But even if one were to forget that, Your Honor, what I just said, the fact that he altered the record certainly impacts any potential future civil suit that the victim and his VA. That is the reason why they have these post-facto analyses of care to determine whether or not there was liability, to determine whether or not some specific person or practice was poorly done. Well, that's a little speculative, isn't it? You don't know. The record doesn't reflect anything that's happened post-death of patient A. Yes, Your Honor. I'm not suggesting that it is. I'm saying that the potential there, that is a potential harm, and that certainly can be taken from the record. Mr. Martinez-Matthews, in his own admission in the factual proffer, stated that the reason he committed these acts was because he knew that there was going to be a post-death evaluation of his conduct. That is why he did it. And he chose these specific documents because they were especially probative as to his level of care. That's why you think that enhancement should apply, that the court apply. Yes, Your Honor. That, as well as the fact that there were a substantial number of records. But that certainly is well. I'm dubious about the substantial number of records theory of yours, or the courts. Well, I'm happy to discuss that, Your Honor, or I can move on to the second of the issues, which was the... The vulnerable victim? Yes, Your Honor. The vulnerable victim. And that is... Before you do that, what about the probative medical record? I have a substantial... It was really just one record with 43 data points changed. Well, yes, Your Honor. I would argue that the record itself is a combination of many different records. The medical record has many different documents within it. It would have the telemetry, the blood oxygenation level, the pulse, how his post-surgical care, x-rays, things like that. You can alter many different documents within a single, an accordion file, if you will. The fact that it's on a computer program, and it can all be accessed by inputting one patient ID number, shouldn't change the fact that there are many different alterations. And I think, Judge Gilman, that you could analogize this to ID theft. If someone were to steal a social security number, a phone number, an address, a name of a single person, those are all different records, even though they correlate to the same individual. Common parlance, I mean, you're usually a patient. You talk about one record. The patient has a medical record. And the fact that it has a lot of data entries doesn't make it multiple records. Well, Your Honor, I would argue that there are multiple records. And at a bank, for instance, or at a law firm, a single client could have one record, one file. But within that file, for instance, you could have a deed, a mortgage, a loan application, a tax return, many different single records within a single file. And that is what this analogy, I think, more closely aligns to. Moving on, Your Honors, to the vulnerable victim. Again, Judge Hall, your point is very well taken. This is a 76-year-old heart patient. And the reason that he was the victim of this case is because his records were altered. That is harm. That's harm to a vulnerable victim. It is relevant conduct. Even if you don't look specifically at this exact offense, it's certainly relevant conduct. How is victim, I mean, how is patient A harmed by the alteration of his records? Well, it's harm or potential harm, Your Honor. The harm doesn't have to be manifest. The And if you look at the Eleventh Circuit pattern guidelines, for instance, I'm sorry, pattern instructions for this offense, it talks about harm, modification of records, potential harm as harms to a victim. And that's pretty clearly, I think, this exact case, Your Honor. A medical record is a document that defines a person. When you harm that record, when you alter documents in that record, in that file, you are harming the person whose file that is. It is both real and actual. Because patient A died, what, 10 hours after he was transferred, and if nobody accessed the changed records before he died, he, in fact, was not actually harmed, was he? Well, the record was harmed. The record was harmed. And, Your Honor, it's... But it's a harm, the enhancement is harm to a victim, not harm to his record. But I mean, when someone's ID is stolen, their person is not... He's dead. I'm sorry, Your Honor. But he's dead. I mean, he died. You couldn't make a vulnerable victim enhancement argument, it seems to me, if the records were altered after the patient had passed away. Or could you? I think you could, Your Honor. Because, again, this would go back to that other point that I made about... You can have a victim who is no longer with us be a vulnerable victim under the guidelines? Yes, Your Honor, I would say that you could, because... What case law do you have to support that proposition? Your Honor, there's a case out of the Ninth Circuit, U.S. v. Haggard, that discusses a very similar circumstance as to the one where... Well, it's a different case, but it's an obstruction charge where a criminal, an incarcerated defendant, went to the FBI and said, I have information about this kidnapping victim's activities, their whereabouts, took the FBI on a chase throughout Northern California before admitting he didn't actually have any information about that kidnapping victim. Now, that was found to be harm to a vulnerable victim. The vulnerable victim in that case was the family of the kidnapping victim. Here... But the family of the kidnapping victim existed. And here, Your Honor... And was alive. Yes, Your Honor. And here, the family of the victim exists. You've never argued that the family is a vulnerable victim. You've argued that the patient's a vulnerable victim. Well, and the patient is a vulnerable victim, and their status is transferred for the purposes of any sort of future civil lawsuit. But not for guideline purposes. Well, that would be the relevant conduct, Your Honor. And additionally, going back to the... You can't keep extending the notion of vulnerable victim down generations and relatives in a family. You've got to pick and choose and go. And I thought that in the district court, your focus was on the patient and not the patient's family as the vulnerable victim. It is, Your Honor. I believe they both qualify. Did you assert the victim's family below? No, Your Honor. No, you did it only the patient. I want to make sure I understand the factual proper, because I thought this was what admitted, and I'm going to ask Mr. Kluh when he gets back up. Part of the problem here and why the patient was the victim is he has, the defendant has admitted that his vital signs deteriorated, but they were never showing up on the machine because he wasn't monitoring it. It had either been manually deactivated, the cables unplugged, one of the two. He doesn't admit which one. So they weren't recorded, and he didn't inform anybody of the deteriorating things, so he got transferred. That's exactly right. So the harm to the victim is, he's in the SICU, and everybody says if we'd known about the deteriorating vital signs, we would have never transferred him to a lower level of care. And the defendant here admits that the signs began to deteriorate. All blood oxygenation, blood pressure, respiratory, and heart rate were all fluctuating abnormally. He admits that, that there was a period of time no vital signs were entered in the computer, and he didn't tell anybody about it, and it was his only patient that day. That is all. He didn't have anybody else, and he was assigned to this man from 8 a.m. to the transfer at 5. He told nobody nothing, and he admits if everybody had known about the deteriorating vital signs, he wouldn't have been transferred. That is all correct. I'm reading from the factual proffer. Is all that in the factual proffer? Everything is in the factual proffer and the unobjected facts in the PSI. Right. Can we turn to the acceptance issue? Yes, Judge. There's error, right? Judge, if the facts are that the judge asserted that he did not have discretion, that is certainly error. I'm asking you your view of the record. Yes, Your Honor. On this record, is there error? I believe there is not, Your Honor. I believe if you look at the bottom of page 7 of the transcript, this is where the judge asked probation, isn't that right? And probation said yes. Then the defense attorney made a full paragraph of argument saying that under certain circumstances you may, you don't have to. Please, we want you not to. At that point, the judge said, well, I'll hold back on that. And then he never comes back to it. No, he does, Your Honor. Later on, on page 9 of the sentencing transcript, he says, if I remove acceptance of responsibility. It's a conditional. It's not when I remove acceptance of responsibility. It's an if. No, but that's only because he's talking about the guideline range. Certainly, Judge. But it is a conditional statement. Why didn't anybody correct the judge? I mean, this is standard, long-settled, guideline law, and 11th Circuit law, that this sort of post-arrest drug use can, but is not always tantamount to a denial of acceptance of responsibility. Judge, from the document itself, I don't have an answer for you. From my presence in the courtroom, based on what Judge Martinez said here, all right, I'll hold off on that. It was clear, to me at least, that he hadn't decided yet. He knew he had discretion based on that statement. But I recognize, Your Honor, that if you disagree with that, then it is certainly error. He flatly states that he seems to me that under the rules, if he tested positive, that's a violation of the law and loses his acceptance of responsibility, and he turns to the probation officer, and the officer says, that's correct, Your Honor. Yes, Judge, but then that's on page 6 of the transcript, and then he comes back and holds off. So that would be, I think, an answer to that. If there are no further questions, Your Honors, the United States would rest on its brief and ask that you affirm. Thank you, counsel. Mr. Kluh? Thank you, Your Honor. Turning to the reference on page 7, what the judge says is, all he says is, basically he's not going to announce the ruling, and I don't see how that can change anything. All that the defense attorney is doing is trying to convince him that he has discretion. He never changes his position, and then he just doesn't give him acceptance. And so it's fairly clear that a remand is appropriate. Even under the government's view of it, I think you'd still have a remand, because it's left in a position where you can't rely, have confidence in the district court's understanding of the guideline. The question that's difficult to deal with from anybody's standpoint in this case is that there was substandard of care, and we rely on so many of these, I guess, the firm's first responders or medical people so much that we really depend on them giving standard at least a certain level of care, and so it's a hard case. I accurately state the admissions of your client, that he wouldn't have been transferred if the signs had all been recorded and they were deteriorating during that 8 a.m. to 5 p.m.? Absolutely. The question then becomes... Okay, so he admits. They said the machines didn't record the deteriorating vital signs. Is that what happened? They say it two ways, but fluctuating is what they really say. Okay, but whatever the machine didn't record the vital signs during this period, because it was either cut off manually or something was going wrong. I can do it real fast, and I won't try to twist it. The patient's ordered to be transferred out of the unit before this nurse comes on duty. He comes on duty after the doctor's... I'm trying to go to the factual proffer, which your client admitted. He admits that the oxygen levels were fluctuating, that some of the readings did not come in. Not all of the readings. The record doesn't show it, but the readings from about 2.30 on were there. As far as the record shows, the reasonable reading of the record and the actual facts is one of the few cases where I'd like to go back on a remand just so that I can get the record made on what actually happened. Mr. Kluth, I've got to go to your factual proffer. Your client admitted that if he had reported the readings, he wouldn't have been transferred. Absolutely, but there's no harm from that. That's the problem. The problem is the showing the government says today, oh, it's a general unit. I disagree strongly about that. Certainly there's nothing in the record to support that. The records show... We're going to talk about extra record stuff. The record shows... Your client said they were deteriorating. He was deteriorating that day and he told nobody. He told nobody, but he turns the patient over at 5 o'clock in the afternoon. From 5 o'clock until... For the next 10 hours, he's monitored, he's got doctors. There's readings... I'm not saying he has to cause the death. I'm trying to say is there any injury. There's none. The government hasn't even said that the person had a better chance of anything, that you get a better code blue, that there's more anything. There's just names attached to things. And the reason why they didn't want to is because it had nothing to do with it. As soon as he gets to the telemetry room that he goes to, immediately they know what his oxygen level is. There's no mystery anymore. That's the problem with the record in this case and why the use of the term speculative, to me, in this case, is very important. The analysis the government uses throughout, they use a conclusory factual proper that doesn't actually address harm. The only thing we know for sure is that the government has stipulated that there is no showing that anything this nurse did caused any harm to this patient at all. That's the only thing we know for sure in this record. The rest is speculation. How can you not cause harm to a patient by not recording deteriorating vital signs? Again, I wanted to correct that one part of the factual proper. It was not a stipulation that he did something to prevent these from happening. The vital signs were shown... There's a window where the vital signs pop off. There's no showing this patient is not ambulatory or whatever. There's two ways it could have happened. The cables could come out, they could not come out. But there's no consistent showing that he turns off the monitor and keeps it from showing. I didn't suggest that. How can there not be harm for a patient who is in a post-surgical ICU unit if you don't record vital signs? Well, the... Whether your vital signs are taken, whether you're there for that sort of a procedure or not, you get your temperature taken, you get your blood pressure taken, etc., etc. I will speak hypothetically and also factually, and the court can take it for what it's worth. The doctor makes rounds at the ICU at 3.30 in the afternoon. At that point, everything's functioning fine. The doctor makes rounds at 3.30, but the doctor who transfers him at 7.30 is there again at 3.30. She's there. She asks Martinez, how's he doing, says he's not eating well. So it's not as if he's ignoring him, he just isn't dealing with the things. The doctor has every opportunity to look at all the records that he could have seen right there. You're just saying that there's another cause. No, there's no cause of anything. What happened is he died in this other unit 10 hours later because they didn't use a defibrillator on him, and that's why the record is so inadequate. Again, I don't think they have to show that they caused the death. I'm reading another statement from the factual partner. During the transfer, Martinez did not inform the receiving unit of the patient's wildly fluctuating vital signs, and your client stipulated to that. That's correct. Okay. That's right. You go on to whatever you want to argue. He gets there at 5 o'clock. They immediately take his blood oxygen. They know right then what his blood oxygen is. There's a massive record here. It wasn't presented. The facts were not presented. What was presented was a conclusory view, but if you're going to operate on a conclusory view, a conclusory factual proper, make sure it ties all the loose ends, is all I'm saying, otherwise you've got to rely on the facts. The facts are he had nothing to do with the patient dying, nothing. The transfer had nothing to do with the patient dying. The facts in terms of the record show that the government has not even argued those things, so that what you have is an interesting but ultimately irrelevant to the death of the patient fact, and that's what we are arguing, that the law simply does not allow him to get these extra punishments for his failures as a nurse, for which he lost his license and would otherwise have gotten his otherwise guidelines. If our objections were correctly, his guidelines would have been one year, about one year, as opposed to five years that he got. Thank you, Your Honor. Mm-hmm. Yeah, I want to take a break and do the rest. I'm fine. You're fine? Okay. I am too. You guys.